## Case No. 3,404.
### In re CROFT et al.

[8 Biss. 188; 17 N. B. R. 324; 10 Chi. Leg. News. 204; 6 Am. Law Rec. 597; 6 N. Y. Wkly. Dig. 218.][1]

District Court, N. D. Illinois. March, 1878.

VOLUNTARY ASSIGNMENT AN ACT OF BANKRUPTCY — INDIVIDUAL EXEMPTIONS FROM PARTNERSHIP ASSETS — ASSIGNMENT IN FRAUD OF CREDITORS —DISCHARGE IN BANKRUPTCY.

1. The making of a voluntary general assignment by a debtor is an act of bankruptcy of itself and must be presumed to have been made in contemplation of bankruptcy.

2. Partnership assets are a trust fund for the payment of the creditors of the firm, and no exemptions can be set apart from them to the individual partners, until all the partnership debts are paid.

[Cited in Re Corbett, Case No. 3,220.]

3. Where prior to the filing of a voluntary petition in bankruptcy, the partners made a general assignment of all their assets, and the assignee set apart a portion of these as exemptions to one of the partners, it was *held*, that the assignment was made for the purpose of preventing some portion of the assets of the firm being distributed to satisfy firm debts, and, *held*, further, that the court under such circumstances would not grant a discharge.

In bankruptcy.

Becker & Dale, for objecting creditors.

BLODGETT, District Judge. This case was submitted to the court and tried upon evidence tending to sustain the following specifications: First—That the bankrupts are voluntary bankrupts. Second—That the bankrupts had within two months from the filing of their voluntary petition in bankruptcy, made a general assignment of all their assets to one Howe, in contemplation of bankruptcy, with intent to prevent their property from coming into the hands of their assignee, or being distributed under the bankrupt law.

The undisputed facts in this case are: That about November, 1871, the bankrupts entered into partnership in the merchant tailoring business in this city; that they then had very little or no capital. Both were young men, and Frederick W. Croft only was married. In the spring of 1871, he had purchased a house and lot in the south part of the city for the sum of $3,228, $200 of which was paid down, and the balance to be paid by monthly payments of $32.28 each, which would make the payments run about seven years from the time the purchase was made. These monthly payments have been regularly made up to the first of last January, and mainly made by Mr. Croft, although his wife has kept boarders and earned money in that way, and earned some money by her needle, to the amount of five or six hundred dollars, which, if not directly applied to the making of these payments, yet aided in keeping them up.

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 6 N. Y. Wkly. Dig. 218, contains only a partial report.]

During the same time, that is between the time the parties commenced business in the fall of 1871, and the time of their bankruptcy, Mr. Frederick W. Croft had furnished his house with furniture to the value of four or five hundred dollars. All the payments for the house, or to apply on the house, were taken out of the partnership business, as well as the money to buy the furniture, with the exception, perhaps, of what was earned by Mrs. Croft [or what is said to have been earned by her].[2]

On the 12th of February, 1876, the bankrupts made a voluntary assignment to one W. E. Howe, of all their partnership and individual assets, "except what were exempt under the laws of the state of Illinois," in trust, to be converted into money, and the proceeds to be applied, first, to the payment of the expense of the assignment, and second, to be ratably distributed to the creditors of the bankrupts, or either of them. At the time of the assignment the firm owed about $4,200 to their commercial creditors. The nominal value of their assets turned over to the voluntary assignee, was a little over $3,000.

Immediately after the making of the assignment, Frederick W. Croft received from the assignee at least one hundred dollars' worth of cloth, and a sewing machine, together with the fixtures in the copartnership store, with the tools used in the business—the shears, cutting table, etc., as exemptions. These, he has testified, he gave to his wife, and with the property so withdrawn from the stock as exemptions, and the sum of $200 borrowed from a brother of the bankrupts, F. W. Croft resumed business in his wife's name and has carried it on up to this time. It does not appear that E. L. Croft received any exemptions from the firm assets, he being at that time an unmarried man.

On the 11th of April, 1876, this voluntary petition was filed. In the schedule of assets no mention is made of the cloth, fixtures, and tools withdrawn from the copartnership assets as exemptions to F. W. Croft, nor of the household furniture of F. W. Croft.

The question occurs then, was this assignment to Howe made in contemplation of bankruptcy? It is admitted that the bankrupts were insolvent and knew themselves to be so at the time this assignment was made. Indeed, this admission is made upon the face of the assignment itself. And as early as the 20th of January preceding this assignment, the bankrupts had addressed a circular letter to each of their creditors informing them of the fact that they had taken an account of stock and liabilities, and found themselves unable to pay over forty cents on the dollar.

Frederick W. Croft, who has been sworn, testifies that he did not contemplate bankruptcy at this time; but he must be held to

have known that the act of making this assignment was in itself an act of bankruptcy. The courts have so held, especially since the case of Globe Ins. Co. v. Cleveland Ins. Co. [Case No. 5,486], decided by his honor, Judge Emmons, in the northern district of Ohio, in 1875. That case has been so generally followed, and the courts have acted upon it so uniformly, that I think it may no longer be considered as an open question, that the making of a voluntary general assignment by a debtor is of itself an act of bankruptcy.

The firm was insolvent at that time, and, by the making of the assignment, they put it in the power of any of their creditors to put them into bankruptcy for this act. A man must be held to have contemplated the natural result and legal consequences of his act; he must be held to have known that his creditors could put him into bankruptcy for making this assignment, although he may not be presumed to know that they would so act.

So that I think from the admitted facts in the case, the assignment must be said to have been made in the contemplation of bankruptcy.

But to prevent a discharge. the assignment must have been made, not only in contemplation of bankruptcy, but it must be made with intent to prefer some creditor, or for the purpose of preventing the property from coming into the hands of his assignee in bankruptcy, or from being distributed in satisfaction of his debts. Does the proof show such intention?

It appears that immediately after the execution of the assignment, within a day or two, the voluntary assignee turned over to F. W. Croft, as a matter of course and without question, the fixtures in the store, the tools of the trade, including a sewing machine, and at least a hundred dollars' worth of cloth, from the partnership stock, with which F. W. Croft immediately resumed business in another locality. This conduct of the parties, simultaneously with the making of the assignment, is sufficient proof to me that such a course was intended at the time the assignment was made. In other words. it was expected that, as part of the transaction, this portion of the partnership assets was to be withdrawn from the hands of the assignee, and go into the control of F. W. Croft, and they were so withdrawn.

The amount so withdrawn was not large, but it was probably all that he could have taken under the bankrupt law, if the property had been his individual property. It must be borne in mind that this Frederick W. Croft had his homestead in the name of his wife; that it had been paid for out of the partnership earnings; he had his house furnished, which is proved to have been paid for out of the partnership earnings, and he then took from the partnership assets the amount he claimed as exemptions, and which was set apart and turned over to him by the

[2] [From 17 N. B. R. 324.]

voluntary assignee. But this court has uniformly held that exemptions cannot be taken from copartnership assets; that the partnership assets are a trust fund for the payment of the creditors of the firm, and that no exemptions can be set apart from them to the individual partners, until all the partnership debts are paid. This has been the rule of this court ever since I have been upon the bench, and I think ever since the bankrupt law was passed.

Upon the admitted facts, then, the conclusion is inevitable that this assignment was made with the intention and expectation that under its operation these exemptions, as they are called, would be withdrawn from the partnership funds, and applied to the benefit of one of the partners, and this intention was carried out.

I must, therefore, hold that this assignment was made in contemplation of bankruptcy, and for the purpose of preventing the property of the firm, or some part of it, from coming into the hands of the assignee in bankruptcy, to be distributed in satisfaction of the debts of the firm. If F. W. Croft had, on filing his petition in bankruptcy, returned these assets to the voluntary assignee, it might have prevented the conclusion to which I have arrived—it might have rebutted the presumption that the intention of the voluntary assignment was to withdraw part of the partnership assets, and prevent them from being applied in satisfaction of the partnership debts.

I conclude, therefore, that this voluntary assignment, and the conduct of the parties under it, makes it incumbent on the court to withhold the discharge.